UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHAHEERAH BAKER, et al., :<br>:<br>Plaintiffs, :<br>:<br>v. :<br>:<br>PROPERTY INVESTORS OF :<br>CONNECTICUT; FRANCISCO & :<br>ASSOCIATES; CLARA STEVENS; :<br>U.S. DEPARTMENT OF HOUSING :<br>AND URBAN DEVELOPMENT; MEL :<br>MARTINEZ, in his capacity as :<br>Secretary of U.S. HOUSING :<br>URBAN DEVELOPMENT; HOUSING :<br>AUTHORITY OF THE CITY OF :<br>BRIDGEPORT; T&D PROPERTIES :<br>OF BRIDGEPORT CORP.; and :<br>WILFREDO SANTOS, :<br>:<br>Defendants. : | CIVIL NO. 3:02cv1839 (AHN) |

<u>RULING ON DEFENDANT UNITED STATES DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT'S MOTION TO DISMISS FOR LACK OF STANDING</u>

Plaintiffs Shaheerah Baker and ten other residents of New Era Court, a low-income housing development project in Bridgeport, Connecticut, have brought suit against the U.S. Department of Housing and Urban Development and then-Secretary Mel Martinez (collectively, "HUD"), the Housing Authority of the City of Bridgeport ("HACB"), Francisco & Associates, Clara Stevens, Property Investors of Connecticut ("PIC"), T&D Properties of Bridgeport Corp. ("T&D"), and Wilfredo Santos.[1]

---

[1] On August 2, 2004, the court approved Plaintiffs' voluntary withdrawal of its action with respect to Defendants HACB, PIC, Francisco & Associates, and Clara Stevens [doc. #77

1

Plaintiffs' Second Amended Complaint ("Complaint") alleges several causes of action brought under different theories of federal statutory and constitutional law and under the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §. 42-110a et seq.). Pending before the court is HUD's Motion to Dismiss Plaintiffs' Complaint for Lack of Standing [doc. #25]. For the reasons discussed below, the motion is GRANTED.

## BACKGROUND

I.  Parties

Plaintiffs are current and former tenants of New Era Court. PIC is a general partnership between Clara Stevens and Francisco and Associates. PIC owned New Era Court until May 8, 2003, when T&D became the new owner; Wilfredo Santos is the president of T&D Properties.[2] HUD administers the federal housing subsidy program made available to low-income families on a national scale. HACB is the local public housing agency in Bridgeport, Connecticut, which administers HUD funds to eligible low-income families.

---

and #78].

[2] The court granted Plaintiffs' motion to join T&D and Santos as defendants on September 22, 2003 [doc. #66].

II. <u>Statutory Framework for HUD's Section 8 Housing Subsidy Program</u>

Two key federal statutes form the statutory framework through which HUD provides housing subsidies to low-income families: the United States Housing Act of 1937, 42 U.S.C. § 1437f ("Housing Act"); and the Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No. 105-65, 111 Stat. 1344 (codified at 42 U.S.C. § 1437f) ("MAHRA"). Section 8 of the Housing Act ("section 8") "aid[s] low-income families in obtaining a decent place to live and . . . promot[es] economically mixed housing," 42 U.S.C. § 1437f(a), by providing federal subsidies to private building owners who are willing to rent to low-income families. These owners enter into Housing Assistance Payment ("HAP") contracts with HUD, which in turn determines the maximum monthly rate they may charge as rent.

A low-income tenant who is eligible to receive section 8 assistance pays thirty percent of her adjusted gross income toward rent; HUD pays the balance to the property owner, and public housing agencies such as HACB typically serve as an intermediary between HUD and the section 8 tenants. <u>See</u> 42 U.S.C. § 1437f(c)(3), 42 U.S.C. § 1437a(a)(1).

Section 8 housing assistance comes in "project-based" or "tenant-based" form. A project-based subsidy is dedicated to a specific apartment building, so that any tenant residing there is eligible to receive section 8 assistance. <u>See</u> 42 U.S.C. §

3

1437f(d). In contrast, a tenant-based subsidy comes in the form of a HUD-funded housing voucher, which the low-income recipient uses to pay rent at any privately owned apartment building that accepts such vouchers. See 42 U.S.C. § 1437f(o).

Plaintiffs' Complaint implicates several key aspects of the section 8 program. For example, if a private building owner intends to terminate a project-based HAP contract with HUD, he is required to provide one-year written notice to HUD and the building's low-income tenants. If the owner fails to provide the required notice, he may not evict a tenant or increase the tenant's rent until a full year has elapsed from the notice date. See 42 U.S.C. § 1437f(c)(8)(B). Furthermore, should the owner choose not to renew the section 8 contract, HUD "will provide tenant-based rental assistance to all eligible residents enabling them to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside." See 42 U.S.C. § 1437f(c)(8)(A). These tenant-based subsidies, generally referred to as "enhanced vouchers," cover any increase in rent charged by the owner after the HAP contract expires in order to "keep[] the tenants' portion of the rent stable at the pre-expiration rate." People to End Homelessness, Inc. v. Develco Singles, 339 F.3d 1, 3 (1st Cir. 2003). Thus, under this statutory framework, even if an owner terminates its HAP contract with HUD, an eligible tenant would continue to pay 30% of her

adjusted gross income toward her housing costs under the section 8 program.

## FACTS

For purposes of considering HUD's Motion to Dismiss for Lack of Standing, the court accepts as true the factual allegations contained in the Complaint. The allegations germane to Plaintiffs' claims against HUD are discussed below.

In August 1995, PIC and HUD executed a five-year, project-based HAP contract that provided project-based housing subsidies to New Era Court. The expiration date of the contract was July 31, 2000. Pursuant to this contract, PIC was to rent all units of New Era Court to low-income tenants, charge each tenant no more than 30% of her adjusted gross income as rent, and comply with HUD regulations. HUD set rents for New Era Court at $735.00 for a two-bedroom unit and $788.00 for a three-bedroom unit.

In early 2000, HUD was considering whether to renew its HAP contract with PIC. To that end, HUD compared the rents charged at New Era Court to those charged at similar area properties. Based on this comparison, HUD determined that New Era Court's rents were too high and that its project-based HAP contract should be renewed at lower rent levels: $600.00 instead of $735.00 for a two-bedroom unit; and $650.00 instead of $788.00 for a three-bedroom unit. PIC unsuccessfully appealed this

determination to HUD. Consequently, on August 17, 2001, PIC gave notice to HUD that it would "opt out" of the section 8 program when its current HAP contract expired on July 31, 2002. PIC also gave its tenants written notice that "[t]he Section 8 contract [which] pays the government's share of your apartment at New Era Court expires on August 17, 2002." Complaint at ¶ 58. PIC, however, also indicated that it could still decide to renew its HAP contract.

On or about November 19, 2001, HUD and PIC executed a short-term, project-based renewal contract to expire on July 31, 2002. This expiration date was 17 days before August 17, 2002, the date on which PIC's HAP contract could legally terminate based on PIC's notice date of August 17, 2001.

In mid-June 2002, New Era Court tenants attended a meeting at HACB where they were told that PIC's project-based section 8 contract would expire on July 31, 2002, and "that the tenants' eligibility for the section 8 [enhanced vouchers] would need to be determined." Complaint at ¶ 64. Although HACB still had not provided Plaintiffs with tenant-based vouchers at this time, HACB told them that they had to decide whether they wanted to remain at New Era Court or relocate to a different property. On June 27, 2002, PIC and HACB held another meeting for New Era Court residents, including Plaintiffs, where they were told that their project-based subsidies would be converted to tenant-based

6

subsidies as of August 1, 2002, in light of PIC's termination of its HAP contract.

According to Plaintiffs, HUD's internal policy guidelines state that "the funding process [for enhanced vouchers] must begin at least 120 days prior to the target date of the Housing conversion action (and at least 180 days in cases where families will have to move to receive voucher assistance)." Complaint at ¶ 62. Nevertheless, even though HUD knew ahead of time that New Era Court residents would need tenant-based vouchers after PIC's HAP contract expired in August 2002, it did not start preparing these vouchers until June 2002. At this late date, HUD also notified HACB that HACB would be in charge of administering the enhanced vouchers to New Era Court tenants. Plaintiffs allege that HUD's delay in providing the vouchers hindered their efforts to find alternative housing because they did not have the vouchers in hand when conducting their housing search. Plaintiffs further complain that HACB miscalculated the dollar amounts of the vouchers.

On or about July 3, 2002, PIC gave tenants written notice that rents would increase to full market rates as of August 1, 2002, but failed to specify the actual dollar amount. On or about July 5, 2002, PIC and HACB demanded that the tenants, even though they still had not been given their tenant-based vouchers, to elect within ten days whether they wanted to stay at New Era

Court or relocate to a different property. Plaintiffs assert that, as a result, they had a "grossly inadequate time frame in which to inform themselves about the housing market before risking the loss of the right to remain at New Era Court using the enhanced [tenant-based] voucher." Complaint at ¶ 68. PIC also advised tenants in July 2002 that if they wanted to remain at New Era Court, they would have to pay an increased security deposit equal to one month's rent.

On July 17, 2002, HACB provided tenants with tenant-based vouchers that had an expiration date of November 13, 2002. On or about July 23, 2002, Defendants orally agreed to enter into three-month leases with tenants, including Plaintiffs, to "provide the plaintiffs with a full 120 days in which to decide whether to exercise their right to remain at New Era Court. Complaint at ¶ 72. Plaintiffs could terminate these short-term leases upon request. Id. With these enhanced vouchers in hand, Plaintiffs now had additional time to make their housing decisions while still living at New Era Court.[3]

On August 1, 2002, HUD permitted PIC to terminate its HAP project-based contract, sixteen days before the correct termination date of August 17, 2002. Between July 29, 2002, and

---

[3] It is unclear from the Complaint when these three-month would begin and end. Presumably, a three-month lease beginning on August 1, 2002, would end on November 1, 2002. At any rate, it appears that Defendants agreed to provide these short-term leases because HUD and HACB had not provided them with their vouchers in a timely fashion.

August 30, 2002, HACB and Clara Stevens signed a new contract purporting to be effective from August 15, 2002, to July 31, 2003. Although PIC had threatened to evict Plaintiffs from New Era Court, there is no allegation in the Complaint that they were ever rendered homeless.

## STANDARD

HUD moves to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. Rule 12(b)(1) under the theory Plaintiffs lack standing to sue HUD. See Fed. R. Civ. P. Rule 12(b)(1) (providing for dismissal due to "lack of jurisdiction over the subject matter"). Under established Second Circuit law, Plaintiffs' Complaint must allege three essential elements: "(1) that the plaintiff . . . suffered an injury in fact . . .; (2) that there [is] a causal connection between the injury and the conduct complained of . . .; and (3) that it [is] likely that the injury complained of would be redressed by a favorable decision." St. Pierre v. Dyer, 208 F.3d 394, 401 (2d Cir. 2000) (internal citations and quotation marks omitted); see also Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103-04 (citations omitted) ("injury in fact, causation, and redressability constitute[] the core of Article III's case-or-controversy requirement").

9

An "injury in fact" is a suffered harm that is "concrete" and "actual or imminent, not conjectural or hypothetical." Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983) (internal quotation marks omitted). The element of "causation" requires a fairly traceable connection between the plaintiff's injury and the defendant's objectionable conduct. See Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976). Third, the injury alleged must be redressable — that is, there must be a likelihood that the requested relief will redress the alleged injury. Id. at 45-46. The party invoking federal jurisdiction bears the burden of establishing the existence of these essential elements. See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990).

## DISCUSSION

I. Plaintiffs' Claims

In their Complaint, Plaintiffs allege in broad terms that HUD's actions violated their rights under the Housing Act, MAHRA, the Administrative Procedures Act at 28 U.S.C. § 701 et seq., and the Fifth Amendment of the U.S. Constitution. Plaintiffs complain that HUD's acts and omissions "directly and proximately caused . . . [them] permanent loss of eligibility for all federal housing subsidy programs, lost wages, squandered savings, debt and other out-of-pocket costs and financial burdens" as well as "severe anxiety, emotional distress, and humiliation associated

10

with the constant threat of homelessness, and severance of their ties to [the] community." Complaint at ¶¶ 116-17.

Reduced to their essence, however, these claims of injury hinge on two key factual allegations. First, Plaintiffs assert that HUD impermissibly allowed PIC to terminate its HAP contract on August 1, 2002, sixteen days before the correct expiration date. Plaintiffs assert that they should have been allowed to remain at New Era Court under the terms of the existing HAP contract until August 17, 2002 (i.e., 16 days longer). Second, Plaintiffs assert that HUD, in conjunction with HACB, needlessly delayed providing them with their tenant-based vouchers in a timely fashion, which adversely affected their efforts to find new housing.[4]

II. Analysis

After a careful review of the 34-page Complaint, the court finds that Plaintiffs do not have standing to sue HUD because the Complaint does not allege that they suffered a legally cognizable injury caused by HUD. Stated differently, Plaintiffs' allegations fail to satisfy the Article III standing requirements

---

[4] The Complaint also asserts that HUD injured Plaintiffs by allowing PIC to charge a security deposit equal to one's month rent effective July 2002. The court finds as a matter of law that this allegation fails to state a legally cognizable injury caused by HUD. Plaintiffs have suffered no injury in this respect because HUD regulations permit private owners with HAP contracts to charge security deposits. See 24 C.F.R. § 982.313. Moreover, it is the property owner, not HUD, that charges the security deposit.

11

of injury in fact and causation. Although the court recognizes that HUD's alleged acts and omissions may have caused Plaintiffs needless worry and inconvenience, the Complaint is bereft of any allegation that Plaintiffs were ever rendered homeless or suffered a concrete harm due to HUD's conduct. Accordingly, the court grants HUD's Motion to Dismiss for Lack of Standing.

### A. HUD's Allegedly Premature Termination of PIC's HAP Contract

From the outset, the court finds that the factual allegations in the Complaint, when read in conjunction with the statutory law underlying HUD's section 8 subsidy program, undermine any claim that Plaintiffs suffered a cognizable injury caused by HUD. As discussed supra, the section 8 program provides that if an eligible tenant contributes 30% of her adjusted gross income to her housing costs, HUD shall subsidize the difference between the actual rent and the participant's contribution. In its motion, HUD does not disagree that it may have allowed PIC terminate its HAP contract sixteen days too early. Plaintiffs, however, fail to allege that they suffered a tangible harm flowing from this premature termination. More specifically, Plaintiffs have not alleged that they were evicted from their New Era Court apartments, that HUD withheld housing subsidies from them, or that they suffered some other concrete harm. Much to the contrary, as the Complaint implicitly

recognizes, Plaintiffs' benefits and obligations under the section 8 program remained constant throughout the pendency of the events giving rise to this litigation. Even after HUD prematurely terminated PIC's HAP contract by sixteen days on August 1, 2002, no Plaintiff was ever denied a HUD housing subsidy or removed from her apartment. Much to the contrary, Plaintiffs were allowed to remain at New Era Court as long as they continued to pay their respective portion of the rent contribution, which remained 30% of her adjusted gross income.[5] If Plaintiffs met this requirement, HUD continued to provide the housing subsidy. Thus, in the absence of an allegation that HUD denied or diminished Plaintiffs' rights under the section 8 program in any tangible or substantial way, the court finds that the Complaint fails to allege injury in fact.

    B.   <u>Alleged Delay in Providing Tenant-Based Vouchers</u>

Similarly, the court is unpersuaded that HUD's alleged role in the delayed provision of the tenant-based vouchers in July 2002 shows that HUD caused Plaintiffs a legally cognizable injury. Plaintiffs contend that this delay left them anxious, unprepared to seek new housing, and caused them significant inconvenience. However, as with the allegations surrounding

---

[5] To the extent that Plaintiffs contend they were entitled to remain in the same building at the same rent indefinitely, such a claim is without statutory support in the Housing Act or MAHRA.

13

HUD's premature termination of PIC's HAP contract, the Complaint is bereft of any allegation that Plaintiffs were evicted or suffered a concrete injury as a result. The court rejects Plaintiffs' contention that anxiety and inconvenience constitute injury in fact for purposes of Article III standing in the context of a case involving section 8 housing subsidies.[6] Furthermore, the court notes that the Complaint alleges that Defendants, including HUD, ultimately gave Plaintiffs additional time to make their housing decisions while residing at New Era Court: "On or about July 23 [2002], through negotiation by counsel for the plaintiffs, the [D]efendants orally agreed to enter into three-month leases which were terminable upon request by the [P]lantiffs, to provide the [P]laintiffs with a full 120-days in which to decide whether to exercise their right to remain at New Era Court." Complaint at ¶ 72. Due to this agreement, Plaintiffs were not evicted from their apartments during this time period and could terminate their leases at any time.

---

[6] The court is not unsympathetic to the Plaintiffs' situation and recognizes that their allegations, if proven, would reveal that HUD and Defendants managed the section 8 program at New Era Court in a sub-standard fashion. Nevertheless, the court has located no authority suggesting that anxiety and inconvenience in this context constitute injury in fact for purposes of Article III standing.

14

C.  Lack of Supporting Case Authority

Finally, the court notes the absence of case law that supports Plaintiffs' position that its Complaint sufficiently alleges constitutional standing.  The most analogous case cited by Plaintiffs, <u>Campbell v. Minneapolis Public Housing Authority</u>, 168 F.3d 1069 (8th Cir. 1999), shares little factual similarity, let alone analytical similarity, to Plaintiffs' claims here and is easily distinguishable.  First, unlike the Plaintiffs who lived continuously at New Era Court, Campbell was a homeless man who applied with the Minneapolis Public Housing Authority ("MPHA") to live in public housing.  <u>Id</u>. at 1071.  Second, HUD was not a defendant in <u>Campbell</u>, and plaintiff's rights there under the section 8 program were not in question.  Rather, the defendant in <u>Campbell</u> was MPHA, the local housing authority, which allegedly injured plaintiff by denying him public housing based on his responses on a MPHA form that disclosed his drug treatment history and required the release of related drug records.  <u>Id</u>. at 1072, 1074.  Thus, <u>Campbell</u> involved a clearly tangible injury that was caused by the defendant's actions; those elements, however, are absent in the instant case.

In sum, the court finds that Plaintiffs lack standing to bring suit against HUD because the Complaint does not allege injury in fact or causation for purposes of Article III standing.

15

CONCLUSION

For the reasons discussed above, HUD's Motion to Dismiss Plaintiffs' Complaint for Lack of Standing [doc. #25] is GRANTED.

SO ORDERED this 24 day of September, 2004, at Bridgeport, Connecticut.

                                        Alan H. Nevas
                            United States District Judge